# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| United States Securities and Exchange Commission, | ) ) ) ) Case No. 1:11-cv-07152 |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| Gregory E. Webb and InfrAegis, Inc. | ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

### SUMMARY

1. The SEC brings this action in response to a fraudulent and unregistered securities offering perpetrated by Defendant Gregory E. Webb ("Webb") and Defendant InfrAegis, Inc. ("InfrAegis"), a corporation that Webb formed and controlled. In the course of that fraudulent offering, from January 2005 through June 2010, Webb and InfrAegis raised at least $20 million from at least 395 investors in 29 states and the District of Columbia through the offer and sale of InfrAegis common stock.

2. Webb and InfrAegis fraudulently raised those funds from investors by falsely portraying InfrAegis as a successful company that had both high-level connections in the homeland security market and lucrative contracts for the sale of InfrAegis' products. In reality, InfrAegis was at all times a startup company that never sold any of the products that Webb and InfrAegis claimed were developed and operational.

3. For example, in both written offering materials and during investor conference calls, Webb and InfrAegis solicited investors by repeatedly making false and misleading statements touting the success of InfrAegis' business, including that:

    a. The City of Chicago had agreed to install one of InfrAegis' products—a kiosk that purportedly can detect the presence of nuclear or biological weapons—throughout the city and that the agreement would result in profits of well over $80 million;

    b. InfrAegis had a contract with the Washington Metropolitan Transit Authority ("WMATA") to install thousands of InfrAegis' kiosks throughout the Metro train system in Washington, D.C. and that the contract was worth $20 billion over twenty years; and

    c. InfrAegis sold a partial stake in the company for $8.7 billion in cash to a company named the DW Group and that the transaction would result in 3800% to 4000% returns to investors.

4. These statements were false and misleading. InfrAegis never sold, and never had any agreements to sell, any of its products to the City of Chicago. Similarly, InfrAegis never sold, and never closed on a contract to sell, any of its products to WMATA. Finally, InfrAegis never received any money from the DW Group and Webb had no reasonable basis to believe that such a transaction would ever take place.

5. In addition to his lies about the success of InfrAegis, Webb unjustly enriched himself at the expense of InfrAegis' defrauded investors, who were the only source of InfrAegis' funds throughout the offering. Despite the fact that InfrAegis never sold a single product, and that InfrAegis' offering materials claimed that he did not receive

compensation from the company, Webb directed InfrAegis to pay him at least $741,000 using investor funds over the course of the offering. In addition to his investor-funded "salary," from April 2005 through June 2010, Webb used an InfrAegis corporate credit card, again funded by InfrAegis investors, to purchase at least $70,000 in goods and services for himself, including vacations, clothing, fast food, groceries, tobacco, liquor, movies, video games, and music.

6. As a result of their misconduct, the SEC seeks a permanent injunction against Webb and InfrAegis to enjoin them from any future violations of the registration and antifraud provisions of the federal securities laws specified below. The SEC further seeks an order requiring Webb and InfrAegis to pay disgorgement, plus prejudgment interest, on all ill-gotten gains they received. The SEC also seeks the imposition of a civil penalty against Webb.

## DEFENDANTS

7. **Gregory E. Webb**, age 64, is a resident of Arlington Heights, Illinois. At all relevant times, Webb was the Chairman, Chief Executive Officer, and President of InfrAegis. According to InfrAegis' offering materials, Webb owned a majority of InfrAegis' stock.

8. **InfrAegis, Inc.**, is a Delaware corporation formed in 2003 under the name Intelagents, Inc. Webb changed the name of the company to InfrAegis in 2005. InfrAegis' principal place of business is in Elk Grove Village, Illinois. InfrAegis purports to design and sell products for the homeland security market. From at least January 2005 through at least June 2010, InfrAegis offered and sold securities to investors. InfrAegis' securities are not registered with the SEC, nor were its offerings.

## JURISDICTION

9. The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e) and 78aa]. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10. The acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.

11. Webb and InfrAegis, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, transactions, practices, and courses of business alleged herein.

## FACTS

**Background**

12. At all relevant times, Webb was InfrAegis' Chief Executive Officer and controlled all aspects of the company's operations. Webb had control over InfrAegis' bank accounts and books and records, he had control over the representations made and the flow of information to investors, and he had control over the use of investor proceeds.

13. Since 2005, InfrAegis' business has purportedly focused on technologies that can thwart terrorist attacks. One of the products touted by Webb and InfrAegis is the "iaMedium" system, an electronic kiosk that supposedly can be used to detect the presence of weapons of mass destruction. InfrAegis marketed the iaMedium as a product

that can be used by municipalities and other government entities to protect critical infrastructure from terrorist attacks.

**InfrAegis' Unregistered Offering of Securities**

14. From January 2005 through June 2010, InfrAegis raised at least $20 million by selling shares of InfrAegis common stock to at least 395 investors in 29 states and the District of Columbia.

15. InfrAegis never registered its offering or securities with the SEC.

16. Webb and InfrAegis offered and sold securities to investors who were not accredited, and more than 35 of InfrAegis' investors were not accredited.

17. Webb and InfrAegis provided investors with various offering materials, including offering memoranda, shareholder newsletters, and executive summaries. Webb developed, controlled, and approved the content of these offering materials, none of which contained audited financial statements.

18. The InfrAegis offering materials that Webb drafted and prepared often preyed on investors' emotions by referencing major terrorist attacks, including the September 11, 2001 terrorist attacks in the United States. For example, InfrAegis' logo, which the company typically included on written offering materials, is a red square with the letters "Ia" in the center and the numbers "911.2001" printed below, an apparent reference to the 9/11 attacks. Some of InfrAegis' offering materials even included photos of the World Trade Center shortly after the 9/11 attacks with smoke billowing from the towers. Certain InfrAegis offering materials also claimed that InfrAegis' products could have prevented major terrorist attacks in London, England and Mumbai, India.

19. In addition to the written offering materials, Webb conducted investor conference calls during which he described InfrAegis' offering and fraudulently touted the company's commercial success to investors. Webb directly solicited investors during the conference calls and encouraged existing investors to add to their investments. Webb also encouraged existing investors to bring in new investors.

20. Webb used salespersons to identify new potential investors and provided the salespersons with extensive information about InfrAegis to pass along to potential investors.

21. Webb personally told investors that they would realize significant returns on their investments in InfrAegis' stock. During investor conference calls, Webb often promised investors returns ranging from 300% to 4900%.

**Webb and InfrAegis' False and Misleading Statements to Investors**

22. The offering materials drafted, prepared, and distributed by Webb falsely portrayed InfrAegis as a successful company that had both high-level connections in the homeland security market and lucrative contracts for the sale of its products. The offering materials contained numerous false and misleading statements relating to contracts between InfrAegis and, among others, the City of Chicago, WMATA, and the United States government. Webb made similar false and misleading statements during investor conference calls.

*InfrAegis' Alleged Agreement with the City of Chicago*

23. From at least August 2006 to April 2010, InfrAegis and Webb repeatedly made false and misleading statements to investors by claiming that the City of Chicago

6

was installing InfrAegis' products throughout the Chicago metropolitan area. For example:

    a. On August 31, 2006, during a conference call, Webb told at least one investor that the City of Chicago had selected InfrAegis' iaMedium system for deployment.

    b. On January 28, 2007, during an investor conference call, Webb told investors that the iaMedium system had received the endorsement of the First Deputy Commissioner and Executive Director of Chicago's Office of Emergency Management and Communications ("OEMC"), and that the iaMedium system was currently undergoing "final review and deployment" by the OEMC.

    c. During that same investor conference call, which took place while Chicago was bidding to host the 2016 Summer Olympics, Webb told investors that InfrAegis had received the endorsement of the 2016 Olympic Committee.

    d. On February 21, 2007, during an investor conference call, Webb told investors that InfrAegis would be deploying 4,000 iaMedium units in Chicago. He then told investors that 100 iaMedium units generate revenues between $80 million and $135 million, and then invited investors to "do the math" on how much revenue the 4,000-unit deployment would generate. Webb also boasted that InfrAegis' contract with Chicago would increase the value of InfrAegis to over $1 billion.

    e. In Offering Memoranda dated July 17 and October 18, 2007, which Webb prepared for distribution to investors, InfrAegis claimed that the company had received oral approval for the initial deployment of 100 iaMedium terminals in the City of Chicago. The July 17, 2007 memorandum stated that 100 iaMediums would generate $114 million annually with net margins in excess of 25%.

    f. In or about December 2008, during an investor conference call, Webb told investors that, beginning the second week of January 2009, the City of Chicago would install 4,000 iaMedium units.

    g. In an Offering Memorandum dated July 4, 2009, which Webb prepared for distribution to investors, InfrAegis claimed that the City of Chicago had agreed to deploy approximately 4,000 iaMedium terminals.

    h. In a draft press release dated December 3, 2009, which Webb provided to a salesperson working to find new investors for InfrAegis, InfrAegis claimed that the iaMedium system had been in full operation in the City of Chicago's 911 Center for an extended period of time.

24. Webb knew that these statements were false and misleading. In reality, InfrAegis never had any sort of agreement or contract with the City of Chicago. Rather, InfrAegis sent an unsolicited proposal to Mayor Richard Daley's Chief of Staff in 2007 and made a presentation to a few city employees in 2008. However, the City of Chicago never entered into a contract with InfrAegis, never agreed to install the iaMedium, and InfrAegis never deployed any devices for the City of Chicago.

*InfrAegis' Alleged Contract with the Washington Metropolitan Area Transit Authority*

25. Throughout 2009 and 2010, InfrAegis and Webb repeatedly made false and misleading statements to investors claiming that WMATA awarded InfrAegis a contract for the deployment of thousands of iaMedium terminals throughout the Metro system in Washington, D.C. For example:

   a. The December 3, 2009 draft press release which Webb prepared for distribution to investors, discussed above, claimed that InfrAegis won the bid to provide the iaMedium system to WMATA, subject to negotiations.

   b. In a February 19, 2010 executive summary which Webb prepared for distribution to investors and provided to at least one InfrAegis salesperson, InfrAegis claimed that on December 18, 2009, InfrAegis was notified that it won WMATA's request for proposal, which, pending contract negotiations, would result in over $20 billion in revenues over twenty years.

   c. On April 15, 2010, during an investor conference call, Webb stated that the iaMedium was being deployed in Washington, DC. Webb specified that about 15,000 iaMediums would be deployed for the city's subway system and another 20,000 would be deployed for the city's streets and major buildings.

26. Webb knew that his claims regarding the WMATA contract were false and misleading. WMATA never awarded InfrAegis a contract for the deployment of the iaMedium. Rather, in July 2009, WMATA agreed to initiate negotiations with InfrAegis, but the negotiations were contingent upon InfrAegis fulfilling its pledge to deposit $615

9

million into an escrow account in January 2010 as proof of InfrAegis' financial wherewithal. InfrAegis never had anywhere near the required $615 million, and the negotiations quickly fell apart when InfrAegis failed to make the deposit. In a January 29, 2010 letter to Webb, WMATA formally terminated negotiations with InfrAegis. Webb never informed investors of WMATA's $615 million deposit requirement or that WMATA had terminated negotiations.

### *InfrAegis' Alleged Sale of a Partial Stake in the Company for $8.7 Billion*

27. Throughout 2009 and 2010, Webb and InfrAegis made false and misleading statements to investors claiming that InfrAegis sold a 51% stake in the company for $8.7 billion to an entity named the DW Group. For example:

    a. In an Executive Summary dated June 18, 2009, which Webb authored and prepared for investors, InfrAegis claimed that it had a signed contract to sell 51% of the company to the DW Group for $8.7 billion. InfrAegis made the same claim in subsequent Executive Summaries, which Webb also authored and prepared for investors, dated August 5, 2009; December 4, 2009; January 20, 2010; and February 19, 2010.

    b. On October 7, 2009, during an investor conference call, Webb told investors that all the DW Group transaction documents had been signed and all due diligence had been completed. Webb further stated that the DW Group was in the process of completing a transaction with the United States government and certain foreign governments that exceeded $1 trillion and that, once the transaction was completed, InfrAegis would begin receiving multiple, multi-billion dollar payments from the DW

10

Group. Webb additionally told investors that once the DW Group transaction was completed, InfrAegis would pay its shareholders—who typically invested at $1.00 per share—between $39 and $41 per share.

28. Webb's claims regarding the sale of 51% of InfrAegis to the DW Group for $8.7 billion were false and misleading. Webb knew that a 51% stake in InfrAegis, a start-up company with no contracts or revenues, was not worth $8.7 billion. Webb also had no reason to believe that the DW Group had the ability to make such a large payment.

**Use of Investor Funds**

29. InfrAegis used most of the offering proceeds to finance its day-to-day operations, to pay the salaries and expenses of the company's executives, and to pay apparently legitimate business expenses associated with the construction of product prototypes and the services of technology consultants.

30. Even though InfrAegis' written offering materials repeatedly stated that Webb received no compensation from InfrAegis, from July 2005 to June 2010 Webb received at least $741,000 directly from InfrAegis' bank accounts. InfrAegis also paid for purchases Webb made on his company credit card. Webb used his company credit card to purchase at least $70,000 in goods and services for himself, including vacations, clothing, fast food, groceries, tobacco, liquor, movies, video games, and music. Webb never reimbursed InfrAegis for the personal expenditures he charged to his InfrAegis company credit card and never disclosed these expenditures to InfrAegis' investors.

11

## COUNT I

**VIOLATIONS OF SECTIONS 5(a) AND (c) OF THE SECURITIES ACT**
**[15 U.S.C. §§ 77e(a) and (c)]**
(Against Webb and InfrAegis)

31. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

32. By their conduct, Webb and InfrAegis directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

33. By reason of the foregoing, Webb and InfrAegis have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## COUNT II

**VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT**
**[15 U.S.C. § 77q(a)(1)]**
(Against Webb and InfrAegis)

34. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

35. By their conduct, Webb and InfrAegis, in the offer or sale of InfrAegis securities, by the use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, have employed devices, schemes or artifices to defraud.

36. Webb and InfrAegis acted with scienter.

37. By reason of the foregoing, Webb and InfrAegis violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

**VIOLATIONS OF SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT
[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**
(Against Webb and InfrAegis)

38. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

39. By their conduct, Webb and InfrAegis, in the offer or sale of InfrAegis securities, by the use of any means or instruments of transportation and communication in interstate commerce and by the use of the mails, directly or indirectly, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in transactions, practices or courses of business that have been operating as a fraud or deceit upon purchasers of InfrAegis securities.

40. By reason of the foregoing, Webb and InfrAegis violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
[15 U.S.C. §78j(b)] AND RULE 10b-5 THEREUNDER
[17 C.F.R. §240.10b-5]**
(Against Webb)

41. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

42. By his conduct in regards to his oral misrepresentations and false and deceiving oral statements described herein, Webb, in connection with the purchase or sale of InfrAegis securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

43. Webb acted with scienter.

44. By reason of the foregoing, Webb violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT V

**VIOLATIONS OF, AND AIDING AND ABETTING VIOLATIONS OF, SECTION
10(b) OF THE EXCHANGE ACT [15 U.S.C. § 78j(b)]
AND RULE 10b-5 THEREUNDER [17 C.F.R. § 240.10b-5]**
(Against Webb and InfrAegis)

45. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

46. By its conduct, InfrAegis, in connection with the purchase or sale of InfrAegis securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business that has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

47. Webb knowingly provided substantial assistance to InfrAegis in the commission of these violations.

48. InfrAegis and Webb acted with scienter.

49. By reason of the foregoing, InfrAegis violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §2 40.10b-5], and Webb is liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT VI

### CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT [15 U.S.C. § 78t(a)]
(Against Webb)

50. Paragraphs 1 through 30 above are realleged and incorporated herein by reference.

51. Webb, as the President, Chief Executive Officer, and Chairman of InfrAegis, (a) directly or indirectly controlled InfrAegis, (b) possessed the power and ability to control InfrAegis as to its violations of Section 10(b) of the Exchange Act and

15

Rule 10b-5 thereunder, and (c) was a culpable participant in InfrAegis' violations of the Exchange Act, including by knowingly or recklessly authorizing and causing InfrAegis to issue the written offering materials described herein.

52. By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Webb is jointly and severally liable with, and to the same extent as, InfrAegis for InfrAegis' violations of the Exchange Act as stated above in Count V.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Find that Webb and InfrAegis committed the violations alleged herein and find that, as a result of these violations, Webb and InfrAegis received ill-gotten gains.

### II.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining:

A. Webb and InfrAegis, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

B. Webb and InfrAegis, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2), (a)(3)];

    C.    Webb, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them; or as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]; from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] and from aiding and abetting such violations; and

    D.    InfrAegis, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

### III.

Order Webb and InfrAegis to disgorge their ill-gotten gains, derived directly or indirectly from the misconduct alleged, together with prejudgment interest thereon.

### IV.

Order Webb to pay the SEC civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### V.

Retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Grant such other and further relief as the Court deems just and appropriate.

Dated:  October 11, 2011

                        Respectfully submitted,

                        **s/Jason A. Howard**

                        BENJAMIN J. HANAUER
                        DANIEL J. HAYES
                        JASON A. HOWARD
                        Attorneys for Plaintiff
                        U.S. SECURITIES AND EXCHANGE COMMISSION
                        175 West Jackson Boulevard, Suite 900
                        Chicago, Illinois 60604
                        Telephone:  (312) 353-8642 (Hanauer)
                        Telephone:  (312) 353-3368 (Hayes)
                        Telephone:  (312) 886-3807 (Howard)
                        E-mail:  hanauerb@sec.gov
                        E-mail:  hayesdj@sec.gov
                        E-mail:  howardja@sec.gov